**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **SHARON PATRICE OGLETREE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **No. 5:12-cv-389 (MTT) (CHW)** |
| | : | |
| **CAROLYN W. COLVIN,** | : | **Social Security Appeal** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## REPORT AND RECOMMENDATION

This case is before the Court for review of a final decision of the Commissioner of Social Security denying Plaintiff Sharon Patrice Ogletree's application for benefits. Plaintiff seeks relief under "sentence four" of 42 U.S.C. § 405(g), stating four claims for relief: (1) the ALJ failed to find Plaintiff's personality disorder "severe;" (2) the ALJ's RFC findings are not supported by substantial evidence; (3) the ALJ improperly found Plaintiff "not credible;" and (4) the ALJ and Appeals Council failed to obtain and consider "other records."

Because none of Plaintiff's legal arguments are persuasive, and because both the ALJ's findings and the Commissioner's final decision are supported by substantial evidence, it is **RECOMMENDED** that the Commissioner's denial of benefits below be **AFFIRMED**.

## ADMINISTRATIVE HISTORY

Plaintiff Sharon Patrice Ogletree claims to suffer from "bipolar disorder, anxiety disorder, and personality disorder." (Doc. 11-2, p. 24). She says that she quit her nursing job in 2006 because she "wasn't getting along . . . with the people and patients," and because she "wasn't sleeping, [and] so [] wasn't really thinking clearly and [was] making some mistakes."

(Doc. 11-2, p. 27-28). She claims to be "scared to go out [of her house]," and "feel[s] like people are always talking about [her]. (Doc. 11-2, p. 32).

Plaintiff applied for Title II and Title XVI benefits in 2008. (Doc. 11-3, pp. 59-60). After her claims were denied initially and on reconsideration, she requested a hearing before an administrative law judge ("ALJ"). (Doc. 11-4, pp. 100-01).

Prior to her July 20, 2011 administrative hearing, Plaintiff asked the ALJ to subpoena mental health records from River Edge Behavior Health Center dating "from March 20, 2010 through present." (Doc. 11-2, p. 20). The ALJ issued two subpoenas—one on July 6 (Doc. 11-2, p. 20), and one on July 23 (Doc. 11-4, p. 68)—and also held the case "in post" for 20 days (Doc. 11-2, pp. 55-56), but River Edge failed to comply. (Doc. 12, p. 13).

Proceeding without the subpoenaed records, and following the five-step sequential evaluation process,[1] the ALJ issued an unfavorable decision on August 19, 2011. (Doc. 11-3, pp. 6-24). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since at least October 10, 2008, her alleged onset date. (Doc. 11-3, p. 11). At step two, the ALJ found that Plaintiff "ha[d] the following severe impairments: bipolar disorder with depression and anxiety." (Id.). At step three, the ALJ found Plaintiff's impairments did not meet or equal any of the impairments listed in Appendix 1.[2] Therefore, the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC") and found that Plaintiff could perform:

> a full range of work at all exertional levels with the following mental limitations: her work is limited to simple, routine, repetitive tasks in a low stress environment, defined as having only occasionally changes in the work setting. She should have no interaction with the general public but is able to have occasional interaction with co-workers. (Doc. 11-3, p. 16).

---

[1] See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).
[2] See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Based on this RFC finding, the ALJ found, at <u>step four</u>, that Plaintiff could not perform any of her past relevant work. (Doc. 11-3, p. 18). At <u>step five</u>, however, the ALJ found that Plaintiff could make an adjustment to "other work."[3] As a result, the ALJ determined that Plaintiff was "not disabled" within the meaning of the Social Security Act.[4] (Doc. 11-3, p. 19).

Plaintiff appealed this unfavorable decision to the Appeals Council, where she presented "new evidence" consisting of at least some of the medical records subpoenaed prior to her administrative hearing. (Doc. 11-9, pp. 13-32). Plaintiff argues that these records, are "not . . . necessarily all of the [subpoenaed] records, as they cover only the time frame of September 21, 2010 to April 21, 2011." (Doc. 12, pp. 13-14). Nevertheless, Plaintiff does not claim with certainty that any "other records" actually exist, and she does not indicate what information these "other records" might contain.

The Appeals Council considered Plaintiff's case, including her "new evidence," but it denied her request for review on August 1, 2012. (Doc. 11-2, p. 2-5).

## PLAINTIFF'S CLAIMS

Plaintiff now asks the Court to reverse the Commissioner's denial of benefits under "sentence four" of 42 U.S.C. § 405(g). In her brief, Plaintiff stated six claims for relief:

I.     Whether the Commissioner improperly failed to find that Plaintiff's personality disorder was a severe impairment at step two of the sequential evaluation process.

II.    Whether the Commissioner improperly rejected some portion of the first opinion of treating psychiatrist Dr. McCard and failed to follow the second opinion of the same doctor even though she assigned it great weight.

III.   Whether the Commissioner failed to properly review and weigh the report of consultative psychiatrist Dr. James DeGroot.

IV.    Whether the Commissioner failed to properly consider the report of reviewing psychologist Lyndis Anderson.

---

[3] *See* 20 C.F.R. § 416.960(c).
[4] *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

V.      Whether the Commissioner failed to properly analyze plaintiff's alleged non-compliance with treatment and engaged in sit-and-squirm jurisprudence.

VI.     Whether the Commissioner failed to complete the administrative record by refusing to require compliance with her own subpoena to River Edge Behavior Health Center and the Appeals Council erred in not reviewing the records supplied post-hearing.

(Doc. 12, pp. 1-2)

Claims two through four each pertain to the sufficiency of the ALJ's RFC findings and, therefore, are considered together. Thus, as restated for the purposes of this preliminary review, Plaintiff's claims are: (1) that the ALJ failed to find Plaintiff's personality disorder "severe" at step two of the five-step sequential evaluation process; (2) that the ALJ's RFC findings are not supported by substantial evidence; (3) that the ALJ improperly found Plaintiff "not credible;" and (4) the ALJ and the Appeals Council failed to obtain and consider "other records."

## STANDARD OF REVIEW

In order to reverse the Commissioner's final decision under sentence four of 42 U.S.C. § 405(g), a Court must find that either the decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the relevant law in reaching her decision. *Jackson v. Chater*, 99 F.3d 1086, 1092 (11th Cir. 1996). Courts may not decide facts, reweigh evidence, or substitute their judgment for that of the Commissioner. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Rather, it is solely up to the Commissioner to resolve conflicts in the evidence. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). Furthermore, even if the evidence preponderates against the Commissioner's findings, the Court must affirm if the Commissioner's decision if it is supported by "substantial evidence," which is defined as "more than a scintilla" and "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth*, 703 F.2d at 1239.

## ANALYSIS

The Commissioner's decision should be affirmed because none of Plaintiff's legal arguments are persuasive, and because both the ALJ's findings and the Commissioner's final decision are supported by substantial evidence.

### PLAINTIFF'S PERSONALITY DISORDER

At step two of the five step sequential evaluation process, ALJs consider the "medical severity" of claimants' impairments. Claimants without "a severe medically determinable physical or mental impairment" are immediately declared "not disabled," thereby ending their claims for benefits.[5]

Plaintiff argues that the ALJ erred at step two of her sequential evaluation. She claims that the ALJ applied an "overly stringent interpretation of the threshold severity requirement," and, as a result, failed to find that Plaintiff's personality disorder was a "severe impairment." (Doc. 12, pp. 4-5). Because the ALJ found that Plaintiff had *a* severe impairment, however, Plaintiff's sequential evaluation did not end at step two. Moreover, because the ALJ adequately considered Plaintiff's personality disorder throughout the evaluation process, any error the ALJ committed at step two was harmless.

Step two is merely a filter designed to screen-out applicants whose medical impairments do not support any claim for relief. *See Stratton v. Bowen*, 827 F.2d 1447, 1452 (11th Cir. 1987) (citing *Bowen v. Yuckert*, 482 U.S. 137 (1987)). Courts review step-two severity findings for harmless error because a finding of *any* severe impairment is sufficient to satisfy step two and allow the ALJ to complete the sequential evaluation process, during which the ALJ will consider "all of the claimant's impairments, whether severe or not, in combination." *Heatly v. Commissioner of Social Security*, 382 Fed. App'x. 823, 825 (11th Cir. 2010) (citing *Jamison v.*

---

[5] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

*Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)). *See also Delia v. Commissioner of Social Security*, 433 Fed. App'x. 885, 887 (11th Cir. 2011) ("Because the ALJ gave full consideration to the consequences of [Plaintiff's] mental impairments on his ability to work at later stages of the analysis, the error at step two was harmless and is not cause for reversal").

Here, the ALJ found that Plaintiff suffered from at least one severe impairment: "bipolar disorder with depression and anxiety." (Doc. 11-3, p. 11). In addition, the ALJ's decision demonstrates that she adequately considered the evidence of Plaintiff's personality disorder in finding Plaintiff "not disabled." For example, at step two of her analysis, the ALJ cited records from Dr. Ray McCard, Plaintiff's treating psychiatrist, and Dr. James DeGroot, a consultative psychiatrist, both of whom indicated that Plaintiff suffered from a personality disorder. (Doc. 11-3, pp. 12-13). The ALJ expressly noted that Dr. DeGroot's "diagnostic impression" included a finding of "personality disorder, not otherwise specified," (Doc. 11-3, p. 13; Doc. 11-7, p. 24), and she cited an October 23, 2008 psychiatric diagnostic report completed by Dr. McCard that found both "P nos" at Axis 1 (secondary), and "mixed" at Axis II. (Doc. 11-3, p. 12; Doc. 11-7, p. 10). Similarly, evaluating Plaintiff's RFC at step four, the ALJ gave "great weight" to the findings of state agency psychological reviewers, including findings that Plaintiff suffered from a personality disorder. (Doc. 11-3, p. 18; Doc. 11-8, pp. 80, 86).

Finally, at step three, the ALJ found that Plaintiff's mental impairments did not satisfy the "paragraph B criteria" of Appendix 1, which claimants must satisfy in order to establish a disabling personality disorder under 20 C.F.R. Pt. 404, Subpt. P, App. 1, No. 12.08 ("Personality Disorders"). The "paragraph B criteria" require that claimants show that they suffer from "two of the following:"

(1) Marked restriction of activities of daily living; or

(2) Marked difficulties in maintaining social functioning; or

(3) Marked difficulties in maintaining concentration, persistence, or pace; or

(4) Repeated episodes of decompensation, each of extended duration.

The ALJ found that Plaintiff suffered from none of the symptoms listed in paragraph B. (Doc. 11-3, p. 15). Specifically, the ALJ found that Plaintiff suffered only (1) "mild restrictions" of activities of daily living; (2) "moderate difficulties" in social functioning; (3) "moderate difficulties" in concentration, persistence, or pace; and (4) "no episodes of decompensation" of an extended duration. (*Id.*). Therefore, the ALJ concluded, Plaintiff failed to satisfy the "paragraph B criteria." (*Id.*). Because these criteria do not change from listing-to-listing, it is of no consequence, as Plaintiff appears to contend, that the ALJ purported to consider Plaintiff's claims under only Nos. 12.04 ("Affective Disorders") and 12.06 ("Anxiety Related Disorders"). (Doc. 11-3, pp. 14-15). Rather, regardless of the ALJ's step two findings, Plaintiff could not have established a disabling personality disorder under 20 C.F.R. Pt. 404, Subpt. P, App. 1, No. 12.08.

## THE ALJ'S RFC FINDINGS

Plaintiff next argues that the ALJ's RFC findings were not supported by substantial evidence. Plaintiff claims that the ALJ:

(a) improperly rejected a 2009 mental impairment questionnaire approved by Dr. Ray McCard, Plaintiff's treating psychiatrist;

(b) failed to incorporate into the RFC the findings of Dr. McCard's 2010 mental impairment questionnaire, to which the ALJ accorded "great weight;"

(c) did not adequately articulate the weight accorded to the psychological examination of Dr. James Degroot, a consultative physician; and

(d) failed to incorporate into the RFC the findings of Dr. Lyndis Anderson, a state-agency psychological reviewer, to which the ALJ accorded "great weight."

Contrary to Plaintiff's assertions, the record indicates that the ALJ had "good cause" to discount Dr. McCard's 2009 opinion, and that the ALJ "adequately articulated" the weight

accorded to Dr. Degroot's opinion. Furthermore, substantial evidence supports the ALJ's RFC findings. Therefore, reversal of the decision below is not warranted.

(a) <u>Dr. McCard's 2009 Mental Impairment Questionnaire</u>

Plaintiff first argues that the ALJ improperly discounted a 2009 mental impairment questionnaire completed by Dr. Ray McCard. (Doc. 11-7, pp. 2-4). Plaintiff notes in her own brief, however, that the 2009 questionnaire differs from a similar 2010 questionnaire also completed by Dr. McCard. (Doc. 11-8, pp. 77-79; Doc. 12, pp. 6-7). While the 2009 questionnaire found that Plaintiff's "ability to deal with changes in the work setting" was "markedly abnormal," the 2010 questionnaire found that Plaintiff's ability to deal with changes was only "abnormal." (*Id.*).

This difference alone indicates sufficient "good cause" to discount Dr. McCard's 2009 questionnaire.[6] *See, e.g.*, *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1179 (11th Cir. 2011) (holding that "good cause" to discount the opinion of a treating physician exists when the physician's opinion is inconsistent with his or her own treatment notes); *see also* 20 C.F.R. §§ 404.1527(c)(4); 416.927(c)(4) (listing "consistency" as a factor for consideration when weighing medical opinions). In addition, though, the ALJ also explained that that she assigned "less weight" to Dr. McCard's 2009 mental impairment questionnaire because Dr. McCard's October 2008 to January 2009 treatment notes did not support "such severe limitations." (Doc. 11-3, p. 18).

Because the ALJ "clearly articulated" "good cause," *Winschel*, 631 F.3d at 1179, and because the ALJ's decision appears to be supported by at least "substantial evidence," the record does not support a finding that the ALJ improperly discounted Dr. McCards 2009 mental impairment questionnaire.

---

[6] The ALJ discusses these questionnaires in Doc. 11-3, pp. 12-14, 18.

(b) <u>Dr. McCard's 2010 Mental Impairment Questionnaire</u>

The ALJ's RFC findings are consistent with the findings of the Mental Impairment Questionnaire completed by Dr. McCard on March 29, 2010. (Doc. 11-8, pp. 77-79). In that Questionnaire, Dr. McCard noted that Plaintiff was "normal" with regard to: orientation; appearance and general behavior; thought processes and flow of mental activity; content of thought; recent and remote memory; insight/judgment/impulse control; and ability to understand, remember, and carry out simple instructions. (*Id.*). He found that Plaintiff's affect and mood were and that she presented as anxious and depressed. (*Id.*). He also observed that she was "abnormal" (as opposed to "markedly abnormal") with regard to: ability to get along with the public, with supervisors, and with co-workers; ability to deal with changes in the work setting; and ability to make simple work-related decisions. (*Id.*). These observations are consistent with the ALJ's RFC, which limits Plaintiff to "occasional interaction with co-workers," and "simple, routine, repetitive tasks in a low stress environment." (Doc. 12, pp. 6-7).

(c) <u>Dr. Degroot's Psychological Examination</u>

Plaintiff next argues that the ALJ did not "explain with particularity" the weight assigned to the psychological examination of Dr. James Degroot, a consulting psychiatrist who conducted an examination on March 21, 2009. (Doc. 12, p. 8). As a general rule, an ALJ "should state the weight [she] accords to each item of impairment evidence and the reasons for [her] decision to accept or reject that evidence." *Lucas v. Sullivan,* 918 F.2d 1567, 1574 (11th Cir. 1990). In this case, the ALJ reviewed Dr. Degroot's findings in detail and explained that she gave "some weight" to Dr. Degroot's findings, but gave greater weight to the findings of Dr. McCard, Plaintiff's treating psychiatrist. (Doc. 11-3, p. 18).

9

The ALJ's review of Dr. Degroot's report shows that his analysis is generally consistent with Dr. McCard's. Like Dr. McCard, Dr. Degroot noted that Plaintiff was appropriately dressed and well groomed, was open and cooperative, demonstrated logical and coherent thought processes, showed fair insight and judgment and intact recent and remote memory, and denied suicidal or homicidal ideation. (Doc. 11-7, p. 24). Like Dr. McCard, Dr. Degroot noted that Plaintiff displayed a depressed affect. (*Id.*). Dr. Degroot's report went into greater detail than the McCard questionnaire concerning Plaintiff's affect, describing her as "hypervigilant" and tearful at times. (*Id.*). Dr. Degroot also assessed a GAF score of 45-50, in contrast with Dr. McCard's GAF score of 55. (*Id.*). These differences are not of great significance and are generally consistent with the RFC determination. To the extent that Dr. Degroot's findings might be read to show greater disability than indicated by Dr. McCard, the ALJ was authorized to assign greater weight to the findings of a treating physician who had a two-year relationship with Plaintiff.

### (d) Dr. Anderson's findings

Plaintiff last argues that the ALJ's RFC findings are inconsistent with the findings Dr. Lyndis Anderson, a state agency reviewer. (Doc. 12, pp. 9-10). The relevant portion of Dr. Anderson's report states:

> C. Not a good candidate for work with the general public, is apt to respond poorly to criticism and may at times distract coworkers with irritability or withdrawal, but can perform adequately at tasks not subject to a great deal of social stress or interaction. These are not substantial limitations. (Doc. 11-9, p. 4).

These findings are not inconsistent with an RFC that allows for "no interaction with the general public" and only "occasional interaction with co-workers," and which limits work to "simple routine, repetitive tasks in a low stress environment." (Doc. 11-3, p. 16). Accordingly, the Court

cannot conclude that the ALJ's RFC findings are inconsistent with Dr. Anderson's medical findings.

## PLAINTIFF'S CREDIBILITY

At her administrative hearing, Plaintiff claimed that she had to leave work once a month due to anxiety attacks, "short[ness] of breath and shaking," and "crying spells." (Doc. 11-2, pp. 37-38). Plaintiff also claimed to need 30-minute breaks about twice a week in order to compose herself. (Doc. 11-2, p. 39). According to Plaintiff, these symptoms, along with her inability to get along with co-workers, caused Plaintiff to quit her nursing job in 2006. (Doc. 11-2, pp. 27-28).

In her unfavorable decision, the ALJ discounted Plaintiff's testimony. The ALJ found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible to the extent that they [were] inconsistent with the [ALJ's RFC findings]." (Doc. 11-3, p. 72).

Plaintiff claims that this negative credibility finding was made in error (a) because the ALJ used impermissible "sit-and-squirm jurisprudence;" and (b) because the ALJ improperly denied benefits due to Plaintiff's failure to follow her course of treatment. Neither of these two claims is persuasive. The ALJ did not use "sit-and-squirm jurisprudence," but rather asked a single question about Plaintiff's demeanor during the course of the hearing. The written decision does not indicate that the ALJ relied on Plaintiff's demeanor in making her negative credibility determination. The record also fails to show that the ALJ denied benefits solely on the grounds that Plaintiff failed to comply with a prescribed course of treatment. Rather, the record shows that the ALJ properly considered Plaintiff's compliance as a factor in assessing the credibility of her testimony.

(a) <u>Sit-and-Squirm Jurisprudence</u>

Plaintiff claims that the ALJ impermissibly based her negative credibility determination on "sit-and-squirm jurisprudence." Courts have condemned such an approach, in which "an ALJ who is not a medical expert will subjectively arrive at an index of traits which [the ALJ] expects the claimant to manifest at the hearing. If the claimant falls short of the index, the claim is denied." *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). There is no indication in the record of this case that the ALJ created such an index of traits or relied on such an index to deny Plaintiff's claim.

Plaintiff's "sit-and-squirm" argument is based on a brief exchange at the conclusion fot the administrative hearing. In this exchange, the ALJ questions Plaintiff about her demeanor:

> ALJ:    Ms. Ogletree, is there anything else you want me to know?
>
> CLMT:  No, ma'am.
>
> ALJ:    Are you sure?
>
> CLMT:  Yes, ma'am, I'm sure.
>
> ALJ:    Why have you not looked at me during this hearing? It appears that you have deliberately avoided eye contact. Why? Because you've looked at your lawyer, but you wouldn't look at me. Why?
>
> CLMT:  I don't' know. I'm scared, nervous I guess, scared, nervous I guess.
>
> ALJ:    Okay. Thank you . . . .

(Doc. 11-2, p. 55)

An ALJ may properly consider a claimant's demeanor in assessing credibility, and the ALJ here appears merely to have inquired as to Plaintiff's demeanor without more. *See, e.g., Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985) ("In *Freeman*, we did not intend to prohibit an ALJ from considering the claimant's appearance and demeanor during the hearing"). There is nothing in the transcript or in the written report to suggest that this question was based on some index of traits that the ALJ improperly expected Plaintiff to manifest.

12

There is no reference to this exchange in the ALJ's decision and no indication that it affected the ALJ's credibility determination. Indeed, the ALJ's only reference to Plaintiff's demeanor at the administrative hearing—that "[h]er affect and mood were abnormal," (Doc. 11-3, p.18)—appears supportive of Plaintiff's position. Because the ALJ properly considered Plaintiff's demeanor without employing "sit-and-squirm jurisprudence," and because it is not clear that Plaintiff's demeanor influenced the ALJ's credibility determination in any way, the ALJ did not err.

(b) Failure to Follow Treatment

Plaintiff next cites *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir.), and argues that the ALJ erred by denying benefits for "failure to follow treatment" without first determining whether (i) Plaintiff actually failed to follow a prescribed course of treatment, and whether (ii) Plaintiff's ability to work would have been restored if she had followed that course of treatment. (Doc. 12, p. 10). This argument misconstrues the ALJ's decision. The ALJ did not deny benefits for failure to follow treatment as in *Lucas*, but instead simply considered Plaintiff's compliance as a factor in weighing the credibility of her testimony.

In *Lucas*, an ALJ improperly concluded that a claimant's "failure to follow treatment" caused her to have seizures, when evidence suggested that Plaintiff instead had an "individual idiosyncrasy in [the] absorption or metabolism of [her medication]" that rendered her medication ineffective. *Lucas*, 918 F.2d at 1572. In other words, the ALJ denied benefits for "failure to follow treatment" without first determining whether Plaintiff's ability to work would have been restored if she had followed her course of treatment. Accordingly, the Eleventh Circuit held that the ALJ failed to "fully and fairly develop the record," and therefore remanded for "diagnostic studies." *Id.*

Unlike the claimant in *Lucas*, Plaintiff was not denied benefits for "failure to follow treatment." Rather, Plaintiff was denied benefits because the ALJ found that, despite her mental impairments, Plaintiff could perform "simple, unskilled work" at "all exertional levels," with certain limitations. (Doc. 11-3, p. 19). In reaching this conclusion, the ALJ properly considered Plaintiff's own subjective assessments of her symptoms. (Doc. 11-3, pp. 17-18). However, the ALJ also properly considered Plaintiff's non-compliance with her therapeutic and pharmacological regimens as a factor in assessing the credibility of her testimony. (Doc. 11-3, pp. 17-18). *See* SSR 96-7p (stating that a claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment prescribed and there are no good reasons for this failure").

Substantial evidence supports the ALJ's finding that Plaintiff was "non-compliant at times with [her] course of treatment and pharmacological regimen," For example, the record indicates that Plaintiff made only "sporadic appts." for therapy and demonstrated "non-compliance regarding [her] medication." (Doc 11-8, p. 14). Plaintiff also failed to seek more accessible therapy sites to compensate for her alleged lack of transportation, (Doc. 11-2, p. 31), and to ask for rides from her friends, with whom she apparently spent time "three to four times per week." (Doc. 11-3, p. 10; Doc. 11-6, p. 54). In light of this evidence, ALJ properly discounted Plaintiff's testimony. (Doc. 11-3, p. 18).

### FAILURE TO CONSIDER "OTHER RECORDS"

Plaintiff last argues that both the ALJ and the Appeals Council failed to consider "other records" held by River Edge Behavioral Health Center. (Doc. 12, pp. 12-14). She claims that the ALJ erred by failing to enforce two subpoenas issued on River Edge, and that the ALJ's decision

to deny benefits was therefore not based on substantial evidence. Plaintiff further claims that the Appeals Council failed to consider some of the subpoenaed records that she later obtained and submitted as "new evidence."

Plaintiff's subpoena argument is unsupported by either the applicable law or the record. Furthermore, because the Appeals Council adequately considered Plaintiff's "new evidence," and because substantial evidence supports the Commissioner's final decision, it is recommended that the decision below be affirmed.

<u>The ALJ's Failure to Enforce the Subpoenas</u>

Plaintiff first claims that the ALJ erred by failing to enforce the July 6 and July 23 subpoenas issued to River Edge Behavior Health Center. (Doc. 12, pp. 12-14). Plaintiff cites no legal authority to support her argument other than 20 C.F.R. § 404.950(d), "Subpoenas," which indicates that ALJs *may* issue subpoenas "[w]hen it is reasonably necessary for the full presentation of a case."

The Commissioner cites to the Hearing Appeals and Litigation Law Manual ("HALLEX"),[7] which provides:

> If an individual refuses or fails to comply with a subpoena, the ALJ must consider any changes in the situation since the subpoena was first issued and again determine whether the evidence or facts requested are reasonably necessary for the full presentation of the case. If so, the ALJ will prepare a memorandum to the OGC Regional Chief Counsel requesting enforcement of the subpoena. HALLEX I-2-5-82 at *1.

This provision appears to vest ALJs with the discretion to decide whether or not to enforce subpoenas based on a second "reasonably necessary" determination. *See, e.g., Serrano v.*

---

[7] HALLEX provisions likely do not carry the weight of law in the Eleventh Circuit. *See George v. Astrue*, 338 Fed. App'x. 803, 805 (11th Cir. 2009) ("[E]ven if we assume that § I-2-8-40 of HALLEX carries the force of law—a very big assumption . . . ."). Nevertheless, an ALJ's prejudicial failure to follow HALLEX procedures may be grounds for reversal. *See, e.g., Tarver v. Astrue*, 2011 WL 206217 at *3 (S.D. Al. Jan. 21, 2011).

*Barnhart*, 2005 WL 3018256 at *2-4 (S.D.N.Y. Nov. 10, 2005) (concluding that "the ALJ's decision not to enforce the subpoena was well within her discretion on the facts presented).

In deciding that Plaintiff's records were not "reasonably necessary" for the full presentation of her case, the ALJ did not exceed the bounds of her discretion. The ALJ based her unfavorable decision on extensive records from River Edge dating from October 2008 to January 2009, (Doc. 11-7, pp. 2-21), and then from March 2009 to March 2010 (Doc. 11-7, pp. 45-55; Doc. 11-8, pp. 2-76). The "new evidence" submitted by Plaintiff to the Appeals Council consisted of records dating from September 2010 to April 2011. (Doc. 11-9, pp. 13-32). Therefore, if "other records" do exist, they only cover the time between April 2010 and August 2010, and between May 2011 and August 2011. (Doc. 13, p. 15). However, Plaintiff neither claims with certainty that other records exist, nor indicates what information those other records might contain. (Doc. 12, pp. 12-14). Instead, she merely alleges that the current administrative record does "not even necessarily [include] all of the records," and that "there is a known unknown as to the contents of the other records." (Doc. 12, pp. 13-14). In addition, Plaintiff's new evidence—the River Edge records dating from September 2010 to April 2011, (Doc. 11-9, pp. 13-32)—does not indicate any material change in Plaintiff's medical condition. Indeed, Plaintiff, in her brief, notes that:

> [a] cursory review of [the new evidence] shows that Dr. McCard reaffirmed his diagnoses of bipolar disorder and personality disorder," and that he "continued and changed medications, [as] Plaintiff was having trouble affording medications." (Doc. 12, p 13).

These facts do not indicate that "other records" exist, and they similarly fail to indicate that any "other records" would necessitate a reversal of the decision below. Without more, in other words, Plaintiff's bare speculation is not enough to show that the ALJ either exceeded her

discretion, or that she did so in a way that prejudiced Plaintiff. Therefore, reversal is not recommended.

<u>The Appeals Council's Failure to Consider Plaintiff's "New Evidence"</u>

Plaintiff last argues that the Appeals Council erred by failing to consider her "new evidence." (Doc. 12, pp. 12-16). The record indicates otherwise. The notice of denial of review states that the Appeals Council considered "material listed on the enclosed Order" (Doc. 11-2, pp. 1-2), including "Medical evidence from River Edge Behavioral Health dated September 21, 2010 through April 21, 2011." (Doc. 11-2, p. 5). Without further comment, the Appeals Council stated that this information did not provide a basis for changing the ALJ's decision.

Generally, the Appeals Council has an obligation to review "new and material evidence" related to the period on or before the ALJ's decision. 20 C.F.R. § 416.1470(b). In reviewing a denial of review by the Appeals Council, courts must "look at the pertinent evidence to determine if the evidence is new and material." *Falge v. Apfel*, 150 F.3d 1320, 1324 (11th Cir. 1998). "'New' evidence is evidence that is non-cumulative, and 'material' evidence is evidence that is 'relevant and probative so that there is a reasonable possibility that it would change the administrative result.'" *Robinson v. Astrue*, 365 Fed.Appx. 993, 996 (11th Cir. 2010), quoting *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir.1987).

The additional evidence presented to the Appeals Council in this case was neither new nor material. The records of treatment at River Edge between September 21, 2010, and April 21, 2011, are cumulative of other records of treatment already in the record. There is nothing in those records that creates a reasonable probability that the ALJ would have or should have ruled differently.

**CONCLUSION**

After careful consideration of the record, and for the aforementioned reasons, it is hereby

**RECOMMENDED** that the Commissioner's denial of benefits below be **AFFIRMED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation with the District Judge to whom the above-styled case is assigned WITHIN FOURTEEN (14) DAYS after being served with a copy thereof.

**SO ORDERED**, this 3rd day of October, 2013.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge